Rattet, Pasternak & Gordon-Oliver, LLP
Attorneys for Tiger Sourcing (HK) Ltd.
550 Mamaroneck Avenue
Harrison, N.Y. 10528
(914) 381-7400

Robert L. Rattet (RLR 2479)
Richard J. Rubin, Of Counsel (RJR 6765)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Tiger Sourcing (HK) Limited,

                Plaintiff

    V

GMAC Commercial Finance Corporation
f/k/a GMAC Commercial Finance-
Canada and Summit Bridge National Investments, LLC,

                Defendants

**COMPLAINT**

Case No.

**08 CIV. 3846**
**BRIEANT**

---

    Plaintiff Tiger Sourcing (HK) Limited ("Sourcing") by Rattet, Pasternak, &

Gordon Oliver, LLP, its attorneys, complaining of the defendants alleges:

### JURISDICTION AND VENUE

    1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section

1332(a) in that there is diversity between the parties hereto and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

    2. Venue in this Court is proper pursuant to 28 U.S.C. Section 1391(a).

## THE PARTIES

3. Plaintiff Sourcing was formed as a Hong Kong corporation and maintains offices in Kowloon, Hong Kong.

4. Upon information and belief, defendants GMAC Commercial Finance Corporation ("GMAC"), was the successor to, or principal or parent of, GMAC Commercial Finance Corporation – Canada ("GMAC- Canada") maintains executive offices in Southfield, Michigan and regularly conducts business in the City and State of New York.

5. Upon information and belief, defendant Summit Bridge National Investments, LLC ("Summit') is a Delaware Limited Liability Company in the business, inter alia, of acquiring distressed debt, and maintains offices in the State of Colorado and in the City and State of New York.

## STATEMENT OF FACTS

### A. The Asset Purchase by Holdings

6. On or about May 3, 2005, Tiger Brand Knitting Company, Limited ("Knitting"), a clothing manufacturer, with the approval of the Canadian Bankruptcy Court, sold all of its assets, property and undertakings to Tiger Brand Holdings Corporation ("Holdings"). Kenneth Lazar ("Lazar") was a shareholder and officer of Holdings and, through wholly owned entities, was a shareholder and officer of Plaintiff, Sourcing. Lazar maintains offices in White Plains, New York.

2

7. It was Holding's plan to continue Knitting's' basic business, the manufacture and distribution of men's, women's and children's clothing, except that the garments previously manufactured and sold in Canada, would now be manufactured in China and the Far East and imported for distribution to the North American market.

8. Prior to the May 3, 2005 purchase, infra, Zhongchen Import & Export Co. Limited ("Zhongchen"), a well known Chinese manufacturer, advised GMAC-Canada, who had agreed with Holdings to finance the above asset purchase, that it had agreed to manufacture and sell goods to plaintiff Sourcing, who, in turn, would sell these goods to Holdings and invoice Holdings for these goods.

9. Simultaneously with the aforesaid Zhongchen arrangements, Sourcing agreed to provide Holdings with a $3.5 million line of credit and receive, in return, a security interest in Holding's assets (the "Suppliers' Lien") which lien would be subordinate to any amounts owing to GMAC in a proposed revolving credit facility to be provided by GMAC to Holdings (the "GMAC Revolver"), but superior in priority to any other obligation that might be owed by Holdings to GMAC, or others, for any other loans or advances.

10. The Asset Purchase Agreement between Knitting and Holdings dated May 3, 2005 provided, inter alia, that any notice that was required to be given to Holdings be sent,

> c/o Lazar Corporate Advisors, Inc.
> 105 Corporate Park Drive
> White Plains, New York 10604
> Attn: Kenneth S. Lazar, Pres.[1]

---

[1] The offices have since moved to 3 Barker Avenue, White Plains, New York 10601.

11.  A Reimbursement Agreement ("Reimbursement Agreement") dated as of

May 3, 2005 between Knitting's Trustee and GMAC-Canada provided that all payments

and communication required under the Reimbursement Agreement be given to GMAC at


3000 Town Center
Suite 280, 3rd Floor
Southfield, Michigan 48075
Attn: Mike Bender

## B.  Holdings- GMAC-Canada Financial Transactions

12.  On May 3, 2005, simultaneously with the above-mentioned asset purchase of

Knitting by Holdings, and the execution of the Reimbursement Agreement between

Knitting's Trustee and GMAC, Holdings and GMAC entered into a Credit Agreement

(the"Credit Agreement") which included:

(a) a fully secured, revolving credit facility (GMAC Revolver) in the

amount of up to $12 million which gave the lender a first lien on all of

Holding's assets in connection with all advances made to Holdings under

this loan;


(b) a term note (the "Term Note") in the amount of $9,608,672.61 which

was inter alia, subject to acceleration upon the occurrence of an event of

default or upon the termination of the Credit Agreement.  The repayment

of this loan was not to commence until December 1, 2005, and was to be

paid monthly thereafter, in a blended payment of principal and interest.

For this portion of the loan, GMAC was given a security interest, in, and

lien upon, all of Holdings property, <u>subject to</u> the first lien described in

subsection (a) above, and further <u>subject to a certain "Supplier Lien" (the</u>

<u>"Supplier Lien")</u>, hereinafter described.  In practical effect, the Term Note

created an unsecured <u>third lien</u> on Holding's assets;


(c) a requirement that Holdings make certain "mandatory prepayments"

(the "Mandatory Prepayments"), to be applied against the Term Note,

from proceeds derived from the sale of certain acquired raw materials,

fixed assets and other collateral all within specified time periods; and


(d)  On, May 3, 2005, Holdings assumed $15,516,529 of Knitting's debt in

exchange for its acquisition of Knitting's assets.


## C.  The Sourcing-GMAC Agreement

13.  On May 3, 2005, simultaneously with and as part of the Credit Agreement,

Sourcing and GMAC entered into a Subordination Agreement (the "Subordination

Agreement") which, in pertinent parts, provide:


(a) [The consideration for the Subordination Agreement is GMAC-
Canada] "…providing financing to the Borrower [Holdings] from time
to time pursuant to the GMAC Credit Agreement…."

(b) "4.  The Supplier [Sourcing] Lien shall be fully postponed and
subordinated to the GMAC Security, until all obligations <u>other than
the Term Loan and other obligations arising solely from the Term
Loan</u> have been satisfied in full…. With respect to the Term Loan and
other obligations arising from the Term Loan, <u>the GMAC Security
shall be fully postponed and subordinated to the Supplier Lien.</u>

Notwithstanding these lien priorities, the Supplier [Sourcing] acknowledges and agrees that the Borrower [Holdings] shall be entitled to make each of the mandatory prepayments… in permanent reduction of the Term Loan…" (emphasis added)

(c) "6.  Until all obligations other than the Term Loan and the other obligations arising solely from the Term Loan have been satisfied in full…the supplier [Sourcing] shall be entitled to receive payment for goods sold and delivered to the Borrower [Holdings] in the ordinary course provided that it has not received notice in writing from GMAC ("GMAC Default Notice") that an event of default has occurred. Upon receipt by the undersigned of the GMAC Default Notice prior to such satisfaction, (i) the Supplier shall not be entitled to receive payment (or any interest therein) for any goods sold and delivered to the Borrower prior to the date of the GMAC Default Notice and (ii) NOTWITHSTANDING ANY OTHER PROVISION OF THE CREDIT AGREEMENT, NO PAYMENTS SHALL BE MADE ON THE TERM LOAN OR OTHER OBLIGATIONS ARISING SOLELY FROM THE TERM LOAN OTHER THAN MANDATORY REPAYMENTS…"(emphasis added)

A true copy of the Subordination Agreement in its entirety is annexed hereto as Exhibit 1.

14.  Most of the negotiations, and the finalization of the above- described financing transactions involving Holdings, Sourcing and GMAC, were conducted on behalf of Holdings and Sourcing by Lazar.

15.  Subsequent to the closing of the aforesaid transactions, all requests by Holdings to GMAC for advances were sent from Holdings' White Plains office to GMAC's New York office.  All advance authorization came from GMAC's New York City office.  Requests for overdraft approval were directed to GMAC's Michigan office.

**D.  The Default And The Events That Followed**

6

16. As of May 3, 2005, Holdings had a borrowing base from the Revolving Loan of $5,907,857.

17. On October 7, 2005, (the "Default Date") GMAC, via telecopy and first class mail (the "Default Notification") notified Lazar, at his White Plains, New York office, that by reason of Holdings failure to timely complete the Mandatory Prepayment requirements, it was declaring a default under the term of the Credit Agreement and expressly reserving "any and all of the rights and remedies that it may have under the Credit Agreement and all other documents executed in connection therewith or relating thereto under applicable law." (emphasis added). A copy of the Default Notification is annexed hereto as Exhibit 2. Lazar notified Sourcing that Holdings had received the Default Notification from GMAC.

18. At the time the Default Notification was given, there was due to GMAC, on the Term Loan, the sum of $9,608,672.61, exclusive of interest.

19. At the time the Default Notification was given, there was due to Sourcing from Holdings, for goods sold and delivered, the sum of $3,707,579.

20. Despite giving its Default Notification, and contrary to Paragraph 6 (ii) of the Subordination Agreement, GMAC, commencing in December, 2005, began debiting Holdings account solely for the purpose of paying down the Term Loan.

21. After receiving GMAC's Default Notification, and in accordance with Paragraph 6 of the Subordination Agreement, the indebtedness due Sourcing, supra, was not reduced but remained open and payable on Holdings' books in the same, or greater, amount.

**E. Enter Summit**

22. By facsimile sent to Holdings' White Plains, New York office, and by regular mail to its office in Ontario, Canada, co-defendant Summit, on January 31, 2007, notified Holdings that it had purchased the Revolving Credit and Term loans from GMAC, effective December 22, 2006. A copy of this notification is annexed as Exhibit 3.

23. Upon information and belief, Summit knew, or should have known, from GMAC and from the terms and conditions set forth in the GMAC Credit Agreement, the Subordination Agreement and the Default Notification, that at the time it acquired the loans, Holdings had failed to timely make the Mandatory Payments had been declared to be in default, which declaration then triggered the default provisions, including the provision that no payments except the Mandatory Payments, could be made to reduce the Term Note.

24. In disregard of the aforesaid provision, Summit debited Holdings account for the sole purpose of paying down the Term Note it had acquired from GMAC.

8

25.  On or about February 23, 2007 Holdings was put in Receivership in the Ontario [Canada] Superior Court of Justice In Bankruptcy and Insolvency (Commercial List), case number 07-CL-6977, and a Receiver appointed.  Upon information and belief, the case has not been closed.

26. Upon information and belief, the Receiver, on August 31, 2007 computed the balance due Summit under the Term Loan to be $7,050,199 as of February, 2007.

**FOR A FIRST CAUSE OF ACTION AGAINST GMAC**

27.  Plaintiff repeats and realleges each allegation set forth in Paragraph "1" through "26" of this Complaint with the same force and effect as if herein fully set forth.

28.  By reason of its negligent and wrongful acts and conduct with respect to debiting Holdings' loan account to pay down the Term Note after it had declared a default, GMAC breached the Subordination Agreement with Sourcing and converted, to and for its own use and benefit, funds that should have been held for the benefit of Sourcing and upon which Sourcing had a valid and enforceable lien superior to GMAC's lien under the Term Note.

29. GMAC should be required to account to Sourcing for all funds it applied against the Term Note subsequent to the Default Notification, and this Court declare that all funds applied by GMAC to the Term Note after the Default Notification were

rightfully the property of Sourcing, held by GMAC for the sole use and benefit of Sourcing, and now to be turned over to Sourcing, with interest thereon.

## FOR A SECOND CAUSE OF ACTION AGAINST SUMMIT

30.  Plaintiff repeats and realizes each allegation set forth in Paragraph "1" through "29" of this Complaint with the same force and effect as if herein fully set forth.

31.  By reason of its negligent and wrongful acts and conduct with respect to debiting Holdings' loan account for the sole purpose of paying down the Term Note it acquired from GMAC while Holdings remained in default, Summit breached the Subordination Agreement, which was an integral part of the loan purchased from GMAC, and converted, to and for its own use and benefit, funds that should have been held for the benefit of Sourcing and upon which Sourcing had a valid and enforceable lien superior to the lien acquired by Summit under the Term Note.

32.  Summit should be required to account to Sourcing for all funds it applied against the Term Note subsequent to its purchase of the loans from GMAC, and this Court declare that all funds so applied by Summit to the Term Note were rightfully the property of Sourcing, held by Summit for the sole use an benefit of Sourcing and now turned over to Sourcing, with interest thereon.

**WHEREFORE**, Plaintiff demands judgment:

(a) On the First Cause of Action, against GMAC, requiring GMAC to account for all funds it applied against the Term Note after the Default Notification until the sale of the Note to co-defendant Summit on December 22, 2006; declaring that all such funds so debited to be the property of Sourcing and held by GMAC for the use and benefit of Sourcing and turned over to Sourcing, with interest;

(b) On the Second Cause of Action against Summit, requiring Summit to account for all funds it applied against the Term Note after the purchase of the Term Note from GMAC, and declaring that all such funds so debited to be the property of Sourcing and held by Summit for the use and benefit of Sourcing and turned over to Sourcing with interest.

together with the costs and disbursements of this action, and for such other and further relief which to this Court may seem proper.

Dated: Harrison, New York

April 23, 2008

Rattet, Pasternak, & Gordon Oliver, LLP
Attorneys for Plaintiff

By _____, Of Counsel
Richard J. Rubin   (RJR 6765)
550 Mamaroneck Avenue
Harrison, NY 10528
(914) 381-7400

**EXHIBIT 1**

# SUBORDINATION AGREEMENT

**TO:**   GMAC Commercial Finance Corporation - Canada ("GMAC")

**RE:**   Tiger Brand Holdings Corp. (the "Borrower")

**WHEREAS:**

(a)   GMAC has or is about to enter into a credit agreement (the "GMAC Credit Agreement") with the Borrower and in connection therewith, the Borrower has granted or will grant security in favour of GMAC (the "GMAC Security") on all property, assets, rights and undertakings of the Borrower of whatsoever nature and kind, now owned or hereafter acquired by or on behalf of the Borrower and wherever located to secure any and all debts, liabilities and indebtedness, direct or indirect, present and future, of the Borrower to GMAC, including, without limitation, any and all indebtedness existing under or in connection with the GMAC Credit Agreement; and

(b)   **TIGER SOURCING (HK) LIMITED** (the "Supplier") is a supplier of the Borrower and has provided the Borrower with a US$3.5 million line of credit pursuant to the letter agreement between the Borrower and the Supplier dated April 21, 2005 (the "Supplier Line of Credit");

NOW THEREFORE, in consideration of GMAC providing financing to the Borrower from time to time pursuant to the GMAC Credit Agreement and for other good and valuable consideration, the receipt by the Supplier and sufficiency of which is hereby acknowledged, the Supplier acknowledges and agrees as follows:

1.   Any terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the GMAC Credit Agreement.

2.   With respect to any present or future property of the Borrower, the Supplier hereby waives, to the maximum extent permitted by law, and agrees not to assert, any rights as an unpaid supplier, including, for greater certainty, rights of revendication or repossession in consequence of being an unpaid supplier and rights under Section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) (the "Supplier Rights"). The Supplier's waiver and agreement provided in this Section 2 may be pleaded by GMAC as a bar and an estoppel in the event that the Supplier claims or asserts any Supplier Rights.

3.   No lien in favour of the Supplier (the "Supplier Lien") against any present or future property of the Borrower, whether by way of security interest, hypothec, lien, title or otherwise, shall secure any amounts or obligations except, at any date, the lesser of US$3.5 million and the aggregate unpaid purchase price for goods sold and delivered to the Borrower in the ordinary course before such date and not paid for, to the extent that all actions and matters required at law in order to perfect such Supplier Lien have been complied with. Except for the Supplier Lien as aforesaid, no claims of the Supplier shall be secured by any lien, charge, encumbrance, security interest or the Supplier Rights.

DOCSTOR: 944174\5

- 2 -

4.  The Supplier Lien shall be fully postponed and subordinated to the GMAC Security until all Obligations other than the Term Loan and the other Obligations arising solely from the Term Loan have been satisfied in full (including repayment of principal owing under the Revolving Credit Facility, all interest and any costs of enforcement). With respect to the Term Loan and the other Obligations arising from the Term Loan, the GMAC Security shall be fully postponed and subordinated to the Supplier Lien. Notwithstanding these lien priorities, the Supplier acknowledges and agrees that the Borrower shall be entitled to make each of the mandatory prepayments set out in Section 2.10 of the GMAC Credit Agreement in permanent reduction of the Term Loan (a copy of which is attached hereto) subject to the provisions of Section 6 hereof upon the issuance of a GMAC Default Notice.

5.  Until all Obligations other than the Term Loan and the other Obligations arising solely from the Term Loan have been satisfied in full (including repayment of principal owing under the Revolving Credit Facility, all interest and any costs of enforcement) and without limiting Section 3 hereof, the Supplier shall not (a) take any actions or steps, by proceedings or otherwise, to enforce any rights or remedies in respect of any present or future property of the Borrower including, without limitation, pursuant to the Supplier Lien or (b) use or rely upon any Supplier Rights or any Supplier Lien granted by the Borrower to the undersigned and/or any registrations in respect of such security filed pursuant to any personal property security legislation in Canada, the United States or elsewhere to assert a security interest, hypothec, lien, title or other interest in any present or future property of the Borrower in priority to the GMAC Security as same secures all Obligations other than the Term Loan and the other Obligations arising solely from the Term Loan.

6.  Until all Obligations other than the Term Loan and the other Obligations arising solely from the Term Loan have been satisfied in full (including repayment of principal owing under the Revolving Credit Facility, all interest and any costs of enforcement), the Supplier shall be entitled to receive payment for goods sold and delivered to the Borrower in the ordinary course provided that it has not received notice in writing from GMAC ("GMAC Default Notice") that an Event of Default has occurred. Upon receipt by the undersigned of a GMAC Default Notice prior to such satisfaction, (i) the Supplier shall not be entitled to receive payment (or any interest thereon) for any goods sold and delivered to the Borrower prior to the date of the GMAC Default Notice and (ii) notwithstanding any other provision of the Credit Agreement, no payments shall be made on the Term Loan or the other Obligations arising solely from the Term Loan other than the mandatory repayments specified in Section 2.10 (a), (b) and (e) of the GMAC Credit Agreement. A GMAC Default Notice may be sent prior to such satisfaction to the Supplier by registered mail or facsimile to the address or facsimile number set forth below (or at such other address or facsimile number hereafter specified in writing by the Supplier) and shall be deemed to have been received by the Supplier on the fifth (5th) Business Day after posting if sent by registered mail and otherwise on the date of transmission (as evidenced by confirmation of receipt) as the case may be.

7.  Without prejudice to the prohibitions in this Subordination Agreement:

(a)    if the Supplier receives any payment in violation of this Subordination Agreement, the Supplier shall receive such payment in trust for GMAC and shall remit it to GMAC forthwith upon receipt to be applied to reduce the Obligations other than the Term Loan and the other Obligations arising solely from the Term Loan.  The Supplier shall be liable to GMAC to the extent of an amount equivalent to any such sums received and not remitted to GMAC; and

(b)    if the Supplier takes possession or causes possession to be taken of any property or assets of the Borrower or otherwise enforces the Supplier Lien in violation of this Subordination Agreement, then, until all Obligations other than the Term Loan and the other Obligations arising solely from the Term Loan have been satisfied in full, the Supplier shall yield or shall cause any party holding the security for its benefit to yield, on demand, possession thereof and any proceeds resulting from the realization thereupon to GMAC or any party acting for GMAC to be applied to reduce the Obligations other than the Term Loan and the other Obligations arising solely from the Term Loan.

8.    Except for the mandatory payments provided for in Section 2.10 (a), (b) and (e) of the GMAC Credit Agreement, GMAC shall not have any rights to enforce the GMAC Security for the Term Loan or to receive payments in respect of the Term Loan following receipt by GMAC of a written notice from the Supplier that Borrower is in default of paying an amount due to the Supplier, until such default is cured or the Supplier Line of Credit is repaid in full and, except for the mandatory payments provided for in Section 2.10 (a), (b) and (e) of the GMAC Credit Agreement, the provisions of Sections 5, 6 and 7 hereof shall apply in favour of Supplier *"mutatis mutandis"*.

9.    This Subordination Agreement will continue in force as long as the Borrower is indebted or liable (either directly, indirectly or contingently) to GMAC.

10.    This Subordination Agreement will enure to the benefit of and be binding upon the respective successors and assigns of the parties hereto.

11.    The interpretation, validity and enforcement of this document shall be governed by and construed under the laws of the Province of Ontario.

12.    The priorities herein referred to shall apply notwithstanding any contrary priority or registration or filing and without the necessity of any further documentation on the part of either GMAC or the Supplier.  However, it is understood that each of the undersigned shall, at the expense of the Borrower, enter into any documentation which either GMAC or the Supplier may require in order to confirm, formalize or give effect to the terms hereof.

13.    This Subordination Agreement may be executed in any number of and by different parties hereto, on separate counterparts, all of which when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

- 4 -

DATED as of the __3rd__ day of __May__, 2005.

TIGER SOURCING (HK) LIMITED

Per: _____

Name:  JOHN GAO

Title:  PRESIDENT

Address for Notices:

Unit 410, Lippo Sun Plaza, 28 Canton Road
Tsim Sha Tsui, Kowloon, Hong Kong

GMAC COMMERCIAL FINANCE
CORPORATION - CANADA

Per: _____

Name: _____

Title: _____

Address for Notices:

150 York Street, Suite 1314
Toronto, ON  M5H 3S9, Canada

- 4 -

**DATED** as of the ___3rd___ day of ___May___, 2005.

<div style="margin-left: 40%;">

**TIGER SOURCING (HK) LIMITED**

Per: _____

Name:

Title:

Address for Notices:

Unit 410, Lippo Sun Plaza, 28 Canton Road
Tsim Sha Tsui, Kowloon, Hong Kong


**GMAC COMMERCIAL FINANCE
CORPORATION - CANADA**

Per: _____

Name: John R. Lauderfield

Title: Executive Vice President

Address for Notices:

150 York Street, Suite 1314
Toronto, ON M5H 3S5 Canada

</div>

- 5 -

The undersigned acknowledges that:

1. it has taken communication of the foregoing Subordination Agreement, is in agreement with the terms thereof to the extent that it is affected thereby and undertakes to cooperate with respect thereto;

2. this Subordination Agreement is for the benefit of the parties thereto only as between themselves and in no manner diminishes, as between either of the parties and the undersigned, any security or rights now or hereafter existing; and

3. no rights or commitments have been created or implied in favour of the undersigned by this Subordination Agreement, and the parties to this Subordination Agreement may, as between themselves, in their sole discretion, alter the terms thereof as they see fit, without reference to the undersigned.

**TIGER BRAND HOLDINGS CORP.**

Per: _____

Name: KENNETHS. LAZAR

Title: PRESIDENT

Address for Notices:

c/o 105 Corporate Park Drive
White Plains, NY 10605 U.S.A.

# EXHIBIT 2

# GMAC Commercial Finance

Kathleen A. Pappalardo
Vice President

Direct :    248-358-8304
Facsimile: 248-327-9350

October 7, 2005

<u>VIA TELECOPIER 914-694-2983</u>

Tiger Brand Holdings Corp.
c/o Lazar Corporate Advisors Inc.
3 Barker Avenue, 5th Floor
White Plains, New York 10601

Attention: Kenneth S. Lazar

Re:    <u>Tiger Brand Holdings Corp.</u>

Dear Mr. Lazar:

Reference is made to the Credit Agreement dated as of May 3, 2005 (the "Credit Agreement") between GMAC Commercial Finance Corporation – Canada ("GMACCFCC") and Tiger Brand Holdings Corp. ("Tiger"). Capitalized terms not otherwise defined herein shall have the meanings given to them in the Credit Agreement.

Tiger has failed to sell all raw materials purchased from TBK within ninety (90) days after the Closing Date, as required by Section 2.10(a) of the Credit Agreement. Furthermore, Tiger has also failed to sell all fixed assets purchased from TBK within one hundred and twenty (120) days after the Closing Date for an aggregate price of at least $1,000,000. As a result, Events of Default, as defined in Section 10.1(e), exist under the Credit Agreement.

GMACCFCC hereby expressly reserves any and all of the rights and remedies that it may have under the Credit Agreement and all other documents executed in connection therewith or relating thereto under applicable law.

Nothing contained herein, or any action or inaction on the part of GMACCFCC, shall be deemed to be a waiver of any rights and remedies available to GMACCFCC with respect the referenced Event of Default, or any other default that may exist, under the Credit Agreement or related documentation.

Very truly yours,

**GMAC COMMERCIAL FINANCE
CORPORATION - CANADA**

By: _Kathleen A. Pappalardo_
        Kathleen A. Pappalardo
CONSISTENT. RESPONSIVE. RELIABLE.    Vice President

# EXHIBIT 3



**Summit**
**Investment**
**Management** LLC

January 31, 2007

Tiger Brand Holdings Corp.                    Via Facsimile 914-253-9003
2550 Argentina Road
Suite 200
Mississauga, Ontario L5N
Attn: Charlie Siegel

RE: GMAC Commercial Finance Corporation - Canada Revolving Credit Note dated May 3, 2005 in the amount of $12,000,000 and Term Note dated May 3, 2005 in the amount of $9,608,672.61 to Tiger Brand Holdings Corp. together with all amendments and modifications

Dear Mr. Siegel:

As you know, GMAC Commercial Finance has sold the above-mentioned loans to SummitBridge National Investments LLC effective December 22, 2006. All payments should be made payable to SummitBridge National Investments LLC and remitted to the following address:

Ocwen Federal Bank FSB
PO Box 203338
Houston TX 77216-3338

Effective Thursday, February 1st, all communications regarding your Credit Note, including advance requests and backup, should be sent via email or facsimile to Colleen Jenkins and Mark Kilcoin.

Fax number: 303-830-9538
Email: cjenkins@summit-investment.com
mkilcoin@summit-investment.com

Neither this letter, nor the transaction between SummitBridge National Investments LLC and GMAC Commercial Finance in any way modifies, extends or waives your obligations contained in the loan documents.

Please contact me to discuss the foregoing.

Sincerely,

Mark A. Kilcoin
Senior Asset Manager

Wells Fargo Center                            720-221-3200
1700 Lincoln Street, Suite 2150               303-830-9538 Fax
Denver, CO 80203                              www.summitinvestment.com